JAMES P. THORSEN, Plaintiff-Appellee and Cross-Appellant, *v.* THE CITY OF CHICAGO *et al.*, Defendants-Appellants.—(SEYMOUR S. GOLDSTEIN *et al.*, Defendants and Cross-Appellees; CLAUDIA LOFTON *et al.*, Defendants.)

First District (2nd Division)    Nos. 77-753, 77-1412 cons.

Opinion filed July 10, 1979.—Rehearing denied August 2, 1979.

100

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale, Philip L. Bronstein, and Mary Denise Cahill, Assistant Corporation Counsel, of counsel), for appellant City of Chicago.

Stern and Rotheiser, of Chicago (James M. Dupree, of counsel), for other appellants.

Ritsos and Ritsos, of Chicago (David Alswang, of counsel), for appellee James P. Thorsen.

Lord, Bissell and Brook, of Chicago (Cornelius P. Callahan and Hugh C. Griffin, of counsel), for cross-appellee Seymour S. Goldstein.

Querrey, Harrow, Gulanick and Kennedy, Ltd., of Chicago (Victor J. Piekarski and John F. Skeffington, of counsel), for cross-appellee Presbitero and Sons, Inc.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, James P. Thorsen, brought this action to recover damages for personal injuries sustained when plaintiff was struck by an automobile as he was walking down the west side of Larrabee Street in Chicago, Illinois. Those named as defendants included Claudia Lofton, the driver of the vehicle; the City of Chicago (the City), which allegedly failed to maintain a sidewalk on the west side of the street, thus making it necessary for pedestrians to use the street; Seymour S. Goldstein (Goldstein), the supervising architect of the construction project that was taking place on City-owned land adjacent to the west side of Larrabee Street; various contractors, including M-Z Construction Co., Presbitero & Sons, Inc. (Presbitero), Shamrock Electric Co., Inc. (Shamrock), and Maloney Plumbing Co., Inc. (Maloney), whose trailers, equipment, building material, and debris allegedly blocked the path where the sidewalk had been; and Maurice Phipps, Philip Barone, and James Kane (the Dramshop defendants), who allegedly sold the liquor that caused the intoxication of Claudia Lofton, by reason of which she struck plaintiff with her automobile.

A jury trial ensued. At the close of plaintiff's case, the trial court granted the motions of Goldstein and Presbitero for directed verdicts, as well as the motion of M-Z Construction Co. for summary judgment. Near the end of trial, plaintiff moved to dismiss Maloney and Shamrock, which

motion was granted with prejudice. Plaintiff's motion to dismiss Claudia Lofton, who never appeared at trial, was also granted. The jury returned a verdict of $150,000. Judgment in that amount was entered against the City, but the court reduced the amount that could be recovered from the Dramshop defendants to $15,000.

The City and the Dramshop defendants have appealed, raising the issue of whether the conduct and remarks of plaintiff's counsel throughout the trial were so improper, outrageous, and prejudicial that defendants were denied a fair trial. The City has also raised issues relating to whether it owed a duty to maintain a sidewalk or provide a safe means of pedestrian travel; whether its failure to do so was the proximate cause of plaintiff's injury; and whether plaintiff was contributorily negligent. Plaintiff has filed a cross-appeal, raising the issues of whether the court erred in directing a verdict in favor of Goldstein and Presbitero; in denying plaintiff's motion that Goldstein be taxed with certain expenses and fees pursuant to section 41 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 41); and in holding that plaintiff's recovery from the Dramshop defendants is limited to $15,000. Plaintiff has also raised an issue with regard to the relief sought by the City and the Dramshop defendants in their notices of appeal.

The following pertinent testimony was adduced at trial. The incident in question occurred approximately midway down the west side of Larrabee Street between Dickens and Webster in Chicago at about 2 o'clock in the early morning of May 9, 1972. Larrabee is a north-south street with two lanes of traffic running in each direction. The land abutting the west side of the street, described as a large vacant tract, was owned by the City at the time of and before the occurrence. Plaintiff introduced evidence tending to show that about three years prior to the occurrence, the sidewalk on the west side of Larrabee had been completely removed. Although two of the City's witnesses testified that they thought there still was a sidewalk on the day in question, in sworn answers to interrogatories that were read to the jury, the City admitted that the sidewalk had been removed prior to May 9, 1972, for the purpose of installing a new water main in connection with a beautification project.

The land on the east side of Larrabee between Dickens and Webster was owned by WGM Associates, which was also originally joined as a defendant. At the time of the occurrence, the sidewalk on that side of the street too had been removed, and construction was also occurring on that side of the street.

Plaintiff testified as to the occurrence. Plaintiff lived one block south and one block west of the relevant section of Larrabee. He testified that during the two-year period that he had lived there prior to May 9, 1972, there were no sidewalks on either side of Larrabee between Dickens and

Webster. During this period plaintiff walked up and down Larrabee once or twice a day. He normally walked in the street, he testified, because it was too difficult to walk on the ground adjacent to the street or to go around.

Plaintiff testified that on the night of May 8, 1972, at about 11 p.m., he walked to a restaurant located on the northwest corner of Webster, Lincoln, and Larrabee. After having dinner and two drinks with a friend, plaintiff and his friend left the restaurant. They proceeded to walk south on the west side of Larrabee toward plaintiff's home. Plaintiff stated that there were no street lights on the portion of the street between Dickens and Webster; however, a City witness testified that there were street lights and that no outages had been reported. Plaintiff walked along the west side of the street about four feet from the curb, while his friend walked between plaintiff and the curb. Plaintiff testified that he observed the condition of the dirt area west of the west curb on Larrabee, and that it was very muddy with large puddles.

When plaintiff was midway down the street, an automobile going north on Larrabee swerved across the center line and struck plaintiff, injuring him. The driver of the car, Claudia Lofton, was arrested by the Chicago police. A certified copy of her plea of guilty and finding of guilty to driving under the influence of alcohol and without a driver's license was read to the jury. The parties also stipulated to the reading of her sworn statement to the jury. In her statement, she admitted that between 8 p.m. on May 8 and 1 a.m. on May 9, 1972, she drank about 10 bottles of beer, two shots of whiskey, and several other drinks of whiskey mixed with water in a tavern on Larrabee called the Maurice Lounge, which was owned by defendant Maurice Phipps. She stated that she was drunk and things had become hazy by the time she left the tavern and walked to her car. She did not recall seeing the man she hit; but rather only heard a bump. She also stated that it was drizzling at the time of the accident. She concluded her statement by saying that she did not think the accident would have happened if she had not been drinking and become drunk. After the accident, both she and plaintiff were taken to nearby Grant Hospital, located on the northeast corner of Webster, Lincoln, and Larrabee.

Defendant Goldstein was called to testify by plaintiff. He stated that he was the supervising architect of a City construction job that had been taking place on Larrabee between Dickens and Webster since 1971. He testified that he thought there were sidewalks at the time of the incident and that they were not removed until later that year or the next. However, in his employment he was concerned with the construction of buildings themselves and not such "external" aspects as streets and sidewalks. He testified that there could have been equipment trailers where the

sidewalks were or had been. He also stated that the location was muddy and puddled and that he sometimes saw pedestrians walking out in the street. He further testified that no one lived on either side of Larrabee between Dickens and Webster at the time in question.

Plaintiff also called as condition witnesses James Toon and Elizabeth Janicek, both whom lived near plaintiff and frequently had occasion to walk down and observe the pertinent portion of Larrabee Street. Each testified that the sidewalk had been removed; that equipment, building material, debris, and mud made it impossible to walk where the sidewalk had been; and that they and other pedestrians therefore usually walked in the street. Each also testified that construction trailers, including some owned by Shamrock and Maloney, were parked on the dirt area about eight or 10 feet from the west curb of Larrabee. Neither could testify as to the condition of the area specifically on the night plaintiff was injured. Other testimony will be presented as pertinent to our discussion of the issues raised on appeal.

The first issue concerns the relief prayed for by the City and the Dramshop defendants in their notices of appeal. Plaintiff contends that because defendants request only reversal, they have waived the right to seek remandment of the cause for a new trial. Plaintiff has moved that the portions of defendants' briefs pertaining to such relief should be stricken. ■■ ■ The purpose of a notice of appeal is to vest jurisdiction in the appellate court and to inform the party in whose favor a judgment has been rendered that review of the case is being sought. In the instant case, defendants' notice sought reversal of the trial court's judgment and of its denial of their post-trial motions, which included prayers for a new trial. Thus, plaintiff was sufficiently apprised that defendants were seeking reversal and remandment for a new trial. (*Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 851, 365 N.E.2d 390.) Indeed, in *National Bank of the Republic v. Kaspar American State Bank* (1938), 369 Ill. 34, 15 N.E.2d 721, cited with approval in *Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, ___ N.E.2d ___, the court held that a complete failure to include a prayer for relief in the notice of appeal was merely an error in form and not substance where there was no showing of prejudice by the appellee. Plaintiff has demonstrated no prejudice here; therefore his contention is without merit and his motion to strike is denied.

The next issue relates to defendants' contentions that the conduct and remarks of plaintiff's counsel throughout the trial were so improper, outrageous, and prejudicial that defendants were denied a fair trial. We have fully reviewed the record on appeal in this regard. At the outset we would note that our supreme court has recognized that the partisanship and heat of battle inherent in a lawsuit militate in favor of granting a

certain latitude to attorneys in representing their clients. (*Crutchfield v. Meyer* (1953), 414 Ill. 210, 214, 111 N.E.2d 142.) The same court also observed that a party can hardly complain about remarks, improper in themselves, that are necessitated by like remarks on the other side. (*Crutchfield.*) While the case at bar is hardly a model of trial procedure, and while the personal animosity displayed by and among opposing counsel is deplorable, we cannot ascribe the responsibility wholly or even chiefly to plaintiff's counsel, who was often only responding in kind to one or another defense counsel. We note that from the examination of the first witness to the end of approximately 1700 pages of testimony, the court admonished and directed all counsel, both within and outside the presence of the jury, to avoid the personal asides and outbursts; yet the conflict continued.

To take the most egregious example, defendants emphasize the fact that in open court and in the presence of the jury, plaintiff's attorney said that counsel for Maloney was lying and that counsel for the City was a liar, "lying through [his] teeth." Yet this was in response to counsel for Maloney's accusation, also in open court and in front of the jury, that plaintiff's lawyer was signaling the witness, in which accusation the City's attorney immediately joined. This matter could and should have been brought to the attention of the court at a sidebar conference. That such a serious accusation in front of the jury would evoke an equally serious response is not surprising and cannot be a ground for complaint. In addition, we note that the trial court properly handled the matter by promptly holding a hearing in chambers, and the court's finding that a mistrial was not warranted is supported on the evidence.

■ Based on our review of the record, we cannot find that plaintiff's counsel's conduct and remarks during the trial, singly or cumulatively, so prejudiced defendants or so "destroyed the fact-finding process" that defendants were denied a fair trial. Neither can we find that, taken as a whole, the closing argument of plaintiff's counsel was of such a nature as to deprive the City of a fair trial. See *Department of Public Works & Buildings v. Mitchell* (1974), 19 Ill. App. 3d 1083, 1085, 312 N.E.2d 691.

■ Defendants also contend that they were prejudiced by the court's decision to allow Elizabeth Janicek to testify at trial, though she was not disclosed as a condition witness by plaintiff's counsel in answer to interrogatories. It is clear from the record that plaintiff did not acquire knowledge of the witness' familiarity with the area and her availability as a witness until long after plaintiff made his answer to the pertinent interrogatory, which answer did disclose the name of Ms. Janicek's husband. Defendants never requested supplementation of the answer nor otherwise requested disclosure of any additional witnesses, and therefore plaintiff was under no duty to advise defendants of the unlisted witness.

(Supreme Court Rule 213(e), Ill. Rev. Stat. 1977, ch. 110A, par. 213(e).) Nevertheless, the trial court chided plaintiff's counsel for violating the spirit of the discovery rules by not disclosing the witness; the court then inquired and permitted inquiry into the testimony Ms. Janicek was to give. Therefore, we cannot find that the court abused its discretion in permitting her to testify, and in view of the fact that the witness' testimony was largely cumulative, admission of her testimony would not be reversible error in any event. *Granger v. Turley* (1959), 20 Ill. App. 2d 488, 491, 156 N.E.2d 610.

We would address one other aspect of plaintiff's counsel's conduct. The City submitted a special interrogatory asking the jury whether plaintiff failed to exercise ordinary care for his own safety. In closing argument, plaintiff's counsel told the jury that the interrogatory was prepared by the City, that under the evidence plaintiff did not fail to exercise ordinary care, and that therefore under the evidence the only fair answer to the interrogatory was "no." After the first reference to the City, the City's objection was sustained, but counsel again mentioned the City, which again objected. Upon correction by the court, plaintiff's counsel acknowledged that the interrogatory was going to come from the court.

■■ The City cites and relies on *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 465, in urging that this constituted reversible error. In *Sommese*, the plaintiff's attorney informed the jury that the special interrogatory had been "slipped in" by the defendant, that the jury's answer to the special interrogatory supersedes its verdict, and that the jury should harmonize its answer with the verdict so as not "to deprive this woman of any right to recovery." While we agree that it was error for the jury in the case at bar to be informed as to the source of the interrogatory and the desired response, we do not believe that the error requires reversal under *Sommese*. The statements here, though improper, are far less prejudicial and cannot be said to defeat the purpose of the special interrogatory. Besides the reference to the City, in effect the remarks only urged that on the evidence the jury should not find that plaintiff failed to exercise care for his own safety. Therefore, while we do not condone the remarks, we cannot assume that "the mind of the jury [was] of such plastic and unreliable material" that the defendants were prejudiced thereby. (*Mrdalj v. Public Service Co.* (1941), 308 Ill. App. 424, 431, 31 N.E.2d 978.) In summary then, we cannot find that defendants were denied a fair trial by virtue of the conduct of plaintiff's counsel.

The next issue is whether the City owed a duty to maintain a sidewalk or provide a safe means of pedestrian travel. The question of duty is a question of law for the court. (*E.g., Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374, 308 N.E.2d 617.) While we have found no Illinois case

considering the precise question of duty raised here, we believe that the existence of such a duty may readily be deduced from existing Illinois law.

■■ It is well settled that a city owes a duty to keep its streets and sidewalks safe for the purpose for which they are intended and for the use of those who are themselves exercising ordinary care. (*E.g., First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 12, 373 N.E.2d 1326; *Storen v. City of Chicago* (1940), 373 Ill. 530, 534-35, 27 N.E.2d 53; *Sherwin v. City of Aurora* (1913), 257 Ill. 458, 462, 100 N.E. 938; *Thien v. City of Belleville* (1947), 331 Ill. App. 337, 345, 73 N.E.2d 452.) It is equally well established that while a city is not liable for its failure initially to provide public improvements such as lights or traffic control devices (section 3—104(a) of the Local Governmental and Governmental Employees Tort Immunity Act, Ill. Rev. Stat. 1977, ch. 85, par. 3—104(a); see, *e.g., Resnik v. Michaels* (1964), 52 Ill. App. 2d 107, 110, 201 N.E.2d 769), once having adopted and embarked upon a plan of public improvements, a city has a duty to maintain those improvements in a condition conducive to the safety of the traveling public (See, *e.g., Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 108—09, 382 N.E.2d 1205; *First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 11, 373 N.E.2d 1326; *Smith v. Godin* (1978), 61 Ill. App. 3d 480, 378 N.E.2d 218, and cases cited therein). Accordingly, while the City would not be liable for failing to provide a sidewalk or other pedistrian walkway in the first instance (*American State Bank v. Cude* (1975), 30 Ill. App. 3d 206, 331 N.E.2d 825; *Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 300 N.E.2d 590), we believe that having once provided a sidewalk, the City thereafter had a duty to maintain it or otherwise provide a safe place to walk, or else give notice to the public that the street was closed to pedestrian traffic.

That public policy militates in favor of such a duty may be inferred from relevant statutes. (See Ill. Rev. Stat. 1977, ch. 85, pars. 3—102 (city has a duty to maintain its property in a reasonably safe condition for people exercising ordinary care in the use of the property in a reasonably foreseeable manner), 3—103 (city is liable if after execution of a plan of improvements it appears from its use that it has created a condition not reasonably safe), and 3—104(b) (city is liable for failing to provide warning signs where necessary to warn of a condition endangering the safe movement of traffic and not reasonably apparent to a person exercising due care); see also Ill. Rev. Stat. 1977, ch. 24, pars. 11—80—3 and 13 (a city may prevent and remove encroachments or obstructions upon streets and sidewalks); Ill. Rev. Stat. 1977, ch. 100½, par. 26 (public nuisance to obstruct or encroach upon public highways).) More particularly, the City's own ordinances express the policy that sidewalks be protected and kept open for pedestrian travel (City of Chicago

Building Code 1978, §76—7), or else that temporary sidewalks with railings and guards be provided (City of Chicago Building Code 1978, §76—7.5), and that warning lights be put where any portion of the public way is obstructed. City of Chicago Building Code 1978, §33—53; see generally City of Chicago Building Code 1978, chs. 33, 34, and 76.

Finally, in the most closely analogous case in Illinois that we have found, a similar result was reached. In *Johnson v. City of Rockford* (1962), 35 Ill. App. 2d 107, 182 N.E.2d 240, a pedestrian was struck by a car after being forced into the street due to an abutting landowner's obstruction of the sidewalk, of which the city apparently knew and approved. One basis for the city's motion to dismiss the plaintiff's action was the city's contention that it had no duty to provide a safe place for pedestrians to walk. Viewing the question as one of proximate causation, the appellate court reversed the dismissal of the action. In doing so, the court sub silentio held that the city did owe a duty to provide a safe place to walk (see also *Brennan v. City of Streator* (1912), 256 Ill. 468, 100 N.E. 266); as has been noted, resolution of the question of duty is often reached through reasoning in terms of proximate cause (See 2 Harper & James, The Law of Torts §18.2, at 1027 (1956), citing, *e.g., Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497). Therefore, *Johnson* offers further support for the result we have reached.

The City cites *City of Rockford v. Hallenbeck* (1889), 34 Ill. App. 40 (dicta), for the proposition that a city may avoid liability entirely by taking sidewalks up, but as the other case cited by the City suggests, that right normally carries with it a duty to close the street to pedestrian traffic. (*Hunter v. City of Montesano* (1910), 60 Wash. 489, 111 P. 571.) The City also cites *Cogdill v. City of Marion* (1959), 22 Ill. App. 2d 99, 159 N.E.2d 28, for the proposition that the City need only maintain its streets and sidewalks in accord with the amount and kinds of use expected to be made of them. However, as plaintiff points out, the City's attempt to characterize the pertinent area as a vast wasteland, and therefore in need of no sidewalks, is amply rebutted by the record. Both plaintiff and Ms. Janicek lived one block south and west of the relevant portion of the street; plaintiff frequented a restaurant one block up the street on the northwest corner while Ms. Janicek worked at the hospital located on the northeast corner. Like many others in the neighborhood, they frequently walked up Larrabee Street. Thus, the City's contention in this regard is without support. Because we agree with the trial court that the City owed a duty as a municipality to maintain a safe place to walk or close the street to pedestrian travel, we need not decide whether the City also owed a duty as an abutting landowner.

■■ The next issue is whether the City's breach of its duty constituted the

proximate cause of plaintiff's injuries. As we have noted above, in *Johnson v. City of Rockford* (1962), 35 Ill. App. 2d 107, 182 N.E.2d 240, the court considered the same question in a similar situation and held that because it was reasonably foreseeable that the plaintiff would be struck by an automobile after being forced into the street, the question was one of fact for the jury. (*Johnson v. City of Rockford* (1962), 35 Ill. App. 2d 107, 114-20, 182 N.E.2d 240, citing, *e.g.*, *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497; accord, *O'Neill v. City of Port Jervis* (1930), 253 N.Y. 423, 171 N.E. 694; see generally Annot., 93 A.L.R. 2d 1178 (1964).) We see no basis for distinguishing the instant case and hold that the rule as enunciated in *Johnson* is applicable to the facts at bar. While the City argues that it could not have foreseen that a drunk driver would swerve and strike plaintiff, since the City's conduct was a substantial factor in bringing about harm to plaintiff, the fact that it might not have foreseen the exact manner in which the harm occurred does not prevent the City from being liable. Restatement (Second) of Torts §435(1) (1965).

■■ The City also argues that plaintiff was contributorily negligent as a matter of law in that he continually chose to walk down Larrabee Street rather than take another way, though he well knew that there were no sidewalks on Larrabee. In a plethora of cases involving use of defective sidewalks by persons with prior knowledge of the defect, it has been recognized that such prior knowledge is not contributory negligence per se; rather, it presents a question of fact for the jury, and if, while walking on that particular occasion, the pedestrian was in the exercise of ordinary care, there may still be recovery. (*E.g.*, *Crown v. Village of Elmwood Park* (1969), 118 Ill. App. 2d 278, 281, 255 N.E.2d 47.) Thus, the question of whether plaintiff failed to exercise reasonable care was properly submitted to the jury. As these are the only contentions raised on appeal by the City, the judgment against the City must be affirmed.

■■ ■ We consider next the issues raised by plaintiff's cross-appeal. First, plaintiff contends that the court erred in granting the motions of Goldstein and Presbitero for directed verdicts. Our supreme court has stated that verdicts ought to be directed only when all the evidence, viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) That standard has been satisfied in the case of both defendants. As to Goldstein, though he was admittedly the supervising architect of the construction project underway on the land adjacent to the street, his testimony that his job related to the buildings themselves and had nothing to do with the sidewalks was unrebutted. As to Presbitero, the only evidence that Presbitero was at the scene of the occurrence was

plaintiff's testimony that he thought one of the trailers might have been Presbitero's. When that portion of his discovery deposition concerning names on trailers was read, the name "Presbitero" was absent. Neither of the other two condition witnesses could place Presbitero at the scene. Accordingly, the trial court did not err in directing verdicts in favor of these defendants.

██ Plaintiff also asserts that the court erred in denying plaintiff's motion that Goldstein be taxed with costs and fees pursuant to section 41 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 41) for making false statements. Specifically, Goldstein stated in answer to one of plaintiff's interrogatories that the sidewalks on Larrabee were removed by J. M. Corbett Engineering Co. (Corbett). Plaintiff then filed an amended complaint which included Corbett as a defendant. It later appeared that Corbett did not do any work for the City on the project until after the occurrence. Goldstein later admitted in a deposition that he was mistaken in stating that Corbett was at the scene. Nevertheless, plaintiff had the burden of showing not just that the answer was untrue, but that it was made without reasonable cause and not in good faith; the trial court properly found that plaintiff failed to sustain this burden. See *Dudanas v. Plate* (1976), 44 Ill. App. 3d 901, 358 N.E.2d 1171.

██ Plaintiff also contends that the court erred in holding that the amount plaintiff could recover from the Dramshop defendants is limited to $15,000. The relevant section of the Dramshop Act (Ill. Rev. Stat. 1977, ch. 43, par. 94 *et seq.*) is section 14, which provides in pertinent part: "In no event shall the judgment or recovery under this Act for injury to the person or to the property of any person as aforesaid exceed $15,000, * * *." (Ill. Rev. Stat. 1977, ch. 43, par. 135.) The purpose of this section is unquestionably to limit recovery under the Act. (*Lichter v. Scher* (1956), 11 Ill. App. 2d 441, 451, 138 N.E.2d 66.) Plaintiff asserts that under the language of the section, he may recover $15,000 for injuries to his person *and* $15,000 for injuries to his property. It is true that the word "property" has a broad meaning within this section (*Howlett v. Doglio* (1949), 402 Ill. 311, 320-21, 83 N.E.2d 708), and it is true that the payment of an injured person's medical expenses by another has been held to be compensable under the Act as an injury to the property of the person paying (*Fortner v. Norris* (1958), 19 Ill. App. 2d 212, 153 N.E.2d 433). But when the *person injured* and the *person who paid the expenses* are one and the same as the person suing, there is but one injury and the plain intent of the section is that there can be but one recovery, not to exceed $15,000, per plaintiff. (See, *e.g., Halka v. Zupan* (1979), 68 Ill. App. 3d 616, 621-22, 386 N.E.2d 439.) Therefore, plaintiff's novel theory must fail. The trial court properly held that plaintiff can recover no more than $15,000 from the dramshop defendants.

For the foregoing reasons, the judgment of the trial court is in all respects affirmed.

Judgment affirmed.

DOWNING and PERLIN, JJ., concur.